**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CR. No. 06-061S** |
| | : | |
| **KENT AWER** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

## INTRODUCTION

The defendant contends that the Court should suppress all evidence obtained as result of the defendant's arrest on the grounds that law enforcement officers seized both the defendant and evidence in violation of the Fourth Amendment of the United States Constitution. The defendant's arguments are without merit.

## FACTS

On May 2, 2006, at 1:13 a.m., Patrolman Andrew D. Dubois with the East Providence Police Department (EPPD), observed a vehicle traveling 68 to 71 miles per hour in a 50 mile per hour speed zone. Patrolman Dubois, after following the vehicle for approximately a half a mile, activated his emergency lights. The vehicle continued switching lanes without signaling and did not stop.

Approximately a half a mile further down the road, the vehicle stopped in a break down lane in a contruction zone along Route 195. Dianikqua Johnson was driving the vehicle; the

defendant, Kent Awer, was riding in the front passenger seat; and Lashon Simmons was riding in the back seat. Patrolman Dubois was alone.

Patrolman Dubois called the stop into dispatch and approached the driver. When he asked the driver for her license and registration, the defendant answered for her, and informed Patrolman Dubois that he had rented the vehicle. The driver stated she did not have a license, but offered to provide a Massachusetts health card. Patrolman Dubois asked the defendant for his license and the rental agreement, and the defendant handed Patrolman Dubois the rental agreement.

Patrolman Floyd Gardner arrived on the scene and Patrolman Dubois asked the driver to exit the vehicle. Patrolman Dubois conducted a patdown search of the driver, arrested her and placed her in his vehicle.[1] While approaching the rental vehicle, Patrolman Dubois noticed the defendant was making movements as though he was trying to conceal something, and turning around to the rear. Upon closer inspection, he observed the defendant, despite the chilly temperatures, to be sweating profusely, and noticed that the defendant was panting.

Patrolman Dubois asked the defendant to exit the vehicle, and the defendant quickly made a movement towards his left side.

---

[1] East Providence Police Department regulations require an officer to arrest an out-of-state driver who does not have a license.

Patrolman Gardner, immediately concerned the defendant was reaching for a weapon, grabbed the defendant's arm and removed him from the vehicle.

Patrolman Gardner then noticed the defendant drop what appeared to be tobacco rolling papers on the ground. Patrolman Gardner instructed the defendant to leave the papers on the ground, but the defendant nonetheless tried to recover them. Patrolman Gardner escorted the defendant to the rear of the vehicle, and Patrolman Dubois asked the defendant to place his hands on his head.

The defendant made a sudden movement towards his left front pocket. The officers grabbed him and secured his hands. Then Patrolman Dubois asked the defendant if he had anything illegal on his person, and the defendant said, "I have marijuana in my pocket." Patrolman Dubois reached in his pocket and retrieved the marijuana. The defendant was then arrested and placed in the rear seat of Patrolman Gardner's cruiser.

At this point, two additional officers arrived on the scene. Patrolman Dubois then approached the rear passenger, Simmons, and obtained his ID. Patrolman Dubois pat searched Simmons and requested a warrant check on him. He also requested a tow truck.[2] Patrolman Dubois also requested a warrant and license

[2] East Providence Police Department (EPPD) regulations provide that upon the arrest of the driver of a vehicle, the vehicle will be towed, unless the owner requests that the vehicle

check on the defendant and the driver of the vehicle, Johnson.

The officers began an inventory search[3]. In the trunk of the rental vehicle, the officers found five bags. Each bag contained many bars of Ivory soap, a technique commonly employed by narcotics traffickers to mask the scent of the narcotics.

Inside one bag, the officers found a vacuum sealed bag containing numerous small baggies of crack cocaine packaged for distribution. The baggies containing the crack cocaine ressembled the baggie seized from the defendant's pocket, and resembled two baggies containing tobacco leaves that were sezied from the center console. In the same bag in which the crack cocaine was found, officers found paperwork belonging to the defendant. The officers also seized three cellular phones from the defendant.

The crack cocaine was later sent to the laboratory and determined to contain cocaine base and weigh 531.2 grams.

All three individuals were taken to the police station. At the station, Patrolman Gardner, who had already been advised of the defendant's extensive criminal history for narcotics trafficking, began a strip search of the defendant.

---

be released to a licensed driver. In this case, the vehicle was owned by Avis Rental Car, and leased to the defendant, who was already under arrest. Accordingly, EPPD regulations require a vehicle in this situation to be towed.

[3]EPPD regulations require that an inventory search be conducted prior to the towing of a vehicle.

The search occurred in a private area in which there were no cameras. No females were present during this search. SGT Nelson, another EPPD officer, witnessed the search.

Patrolman Gardner asked the defendant to remove his clothing. According to standard practice, Patrolman Gardner asked the defendant to squat, spread his buttocks, and cough. Patrolman Gardner observed a plastic bag between the defendant's buttocks and asked him to remove the baggie. Inside was an additional quantity of crack cocaine, later determined to weigh 3.2 grams.

## ARGUMENT

### I. PATROLMAN DUBOIS LAWFULLY STOPPED THE DEFENDANT'S RENTAL VEHICLE.

It is well-established "so long as officers have probable cause to believe a traffic violation has occurred, it is reasonable for them to stop an automobile and temporarily detain the driver." United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997); see Whren v. United States, 517 U.S. 806, 819 (1996). Moreover, the officer's subjective intentions do not invalidate an otherwise valid traffic stop. See Whren, 517 U.S. at 819; Bizier, 111 F.3d at 218.

In this case, Patrolman Dubois stopped the defendant's rental vehicle for speeding. He had probable cause to believe that the vehicle was speeding because he paced it for a half mile traveling 68 to 71 miles per hour in a 50 miles per hour speed

zone. Although Patrolman Dubois had no ulterior motives, and had no prior knowledge of the defendant, even if he had suspected the defendant of narcotics trafficking, such subjective intentions would not render the traffic stop unconstitutional.

## II. PATROLMAN DUBOIS LEGALLY REMOVED THE DEFENDANT FROM THE VEHICLE AND HAD REASONABLE AND ARTICULABLE SUSPICION TO CONDUCT A PATDOWN SEARCH OF THE DEFENDANT.

"[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997); see also United States v. Coplin, ----F.3d ----, 2006 WL 2686529, at *5 (1st Cir. September 20, 2006). Although the officer may order the passenger to step outside of the car, the officer must have reason to believe that the passenger is armed and dangerous to conduct a pat-frisk for weapons. See United States v. McKoy, 428 F.3d 38, 41 (1st Cir. 2005); United States v. Cruz, 156 F.3d 22, 26 (1st Cir. 1998); United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997)(recognizing Maryland v. Wilson is a bright-line rule); see also United States v. Greene, 129 F.3d 1252, 1997 WL 642275, at *2 (1st Cir. 1997) (unpublished) (recognizing that merely ordering an individual out of a vehicle is a lesser intrusion than conducting a frisk).

Factors to be considered in evaluating the reasonableness of the officer's decision to conduct a pat-frisk for weapons are (1) the time of day; (2) the location of the stop; (3) the manner in

which the vehicle traveled as well as how it came to a stop; (4) the number of occupants; (5) the conduct and appearance of those occupants; and (6) the type of crime committed. See Cruz, 156 F.3d at 26; United States v. Soares, ---- F.Supp.2d ----, 2006 WL 2664371, at *4 (D.Mass. September 13, 2006).

The defendant relies upon United States v. McKoy, 428 F.3d 38 (1st Cir. 2005), a case in which the court suppressed the evidence seized during a weapons frisk; however, McKoy is factually distinguishable from the case at hand. In McKoy, the officers stopped McKoy in the middle of the day, in a high-crime neighborhood, for a parking and license violation. Upon approaching the vehicle, the officers noticed that McKoy appeared nervous and reached towards the center console. The First Circuit concluded that these facts did not warrant a reasonable inference that the defendant was armed and dangerous.

The case at hand, however, differs significantly. For one, there was no pat down frisk prior to the discovery of the marijuana.

Moreover, the facts leading up to the discovery of the defendant's marijuana were markedly different from those in McKoy. Patrolman Dubois stopped the defendant's rental vehicle at 1:13 a.m. for traveling 18 to 21 miles over the posted speed limit. After following the vehicle at this speed for a half a mile, Patrolman Dubois activated his lights, but the defendant's

vehicle did not stop. Instead, it continued for another half a mile before pulling over.

These circumstances present Patrolman Dubois with a greater risk of danger than the officers in McKoy faced. The darkness makes it more difficult to observe the occupants of the vehicle, and the very nature of the offense is more dangerous than a parking violation. Furthermore, the delay in stopping provided the occupants of the defendant's vehicle with an opportunity to grab a weapon, or conceal contraband. The delay certainly was reason for suspicion.

Upon approaching the vehicle, Patrolman Dubois, who was alone, realized that he was outnumbered by the three individuals in the vehicle. This also presented a more threatening situation than the one facing the officers in McKoy.

It struck Patrolman Dubois as suspicious that the defendant answered for the driver of the vehicle as he began to question her. Patrolman Dubois learned the three occupants were traveling from New York, which added to his suspicion since New York is a source city for narcotics in this region. Ms. Johnson, who was driving, denied ever having a driver's license, and offered an out-of-state health card instead. While Patrolman Dubois was questioning Ms. Johnson, the defendant interjected to inform Patrolman Dubois that he had rented the vehicle. In order to

confirm the rental was made to the defendant, Patrolman Dubois asked him to produce the rental documents, which he did.

Patrolman Dubois arrested Ms. Johnson and placed her in his vehicle. While walking back to the rental vehicle he noticed the defendant moving around in a suspicious manner. The defendant was making movements to his left and kept turning around. It appeared to Patrolman Dubois that the defendant was trying to hide something. Unlike in McKoy, where the court ascertained the defendant may have been reaching for his license, the defendant had already produced the rental documents at the initial encounter.

When Patrolman Dubois arrived at the passenger window, he noticed that the defendant was panting heavily and sweating an unusual amount given the night temperatures. Then, unlike the McKoy case, when Patrolman Dubois asked the defendant to step outside of the vehicle, the defendant disregarded the command and instead began to move towards the floor board. This sudden action caused Patrolman Gardner to grab the defendant and remove him from the vehicle.

Upon removing the defendant from the vehicle, Patrolman Gardner stood towards the front of the car, and the defendant stood between him and Patrolman Dubois, who was near the rear passenger side door. At this time, Patrolman Gardner noticed the defendant drop an object. Although he instructed the defendant

to leave the rolling papers, once again the defendant disregarded the officers' commands and reached for the papers. Patrolman Gardner escorted the defendant to rear of the vehicle.

Then, upon Patrolman Dubois' request that the defendant place his hands on his head, the defendant made a quick movement towards his pocket. Now thoroughly alarmed, the officers secured his hands and asked the defendant if he had anything illegal, to which the defendant responded that he had marijuana in his pocket.

In sum, this case differs from McKoy because Patrolman Dubois was initially alone; it was the middle of the night; the vehicle was a rental and traveling nearly 20 miles over the speed limit; the occupants were coming from New York City; the driver did not have a license; the defendant was exceedingly and unusually nervous; the defendant had already produced the rental document requested by Patrolman Dubois, yet the defendant made multiple, suspicious movements and gestures; the defendant did not obey commands; and the defendant made sudden movements. See United States v. Ivery, 427 F.3d 69, 73 (1st Cir. 2005) (surveying cases discussing reasonable suspicion); Cruz, 156 F.3d at 26 (concluding the officer would have been "'foolhardy'" not to have frisked the defendant because of the time of day, the location, the speed the vehicle was driven, the manner in which it stopped and the commotion amongst the occupants as the officer

approached); Soares, 2006 WL 2664371, at *5 (distinguishing McKoy because the officer had noticed a suspicious jar in the vehicle, and Soares had disobeyed his orders to stay still and keep his hands visible during the stop).

**III. THE 531.2 GRAMS OF CRACK COCAINE SEIZED FROM THE DEFENDANT'S BAG WAS DISCOVERED PURSUANT TO A LAWFUL INVENTORY SEARCH.**

After discovering the marijuana in the defendant's pocket, Patrolman Dubois arrested the defendant. Then, pursuant to EPPD policy, Patrolman Dubois called for a tow truck, and the officers began an inventory search of the defendant's rental vehicle. The defendant moves to suppress the crack cocaine discovered during the inventory search claiming that vehicle was unlawfully seized because (1) there is no policy regarding seizure of a vehicle, and (2) the officers did not allow the defendant the option of having a third party remove the vehicle.

While an impoundment decision made pursuant to standardized procedures will likely satisfy the Fourth Amendment, the courts also recognize that a seizure pursuant to a community caretaking function is "consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances." United States v. Coccia, 446 F.3d 233, 238-39 (1st Cir. 2006); United States v. Rodriguez-Morales, 929 F.2d 780, 785-86 (1st Cir. 1991).

In Rodriguez-Morales, 929 F.2d at 785, the First Circuit held that upon finding that neither occupant of a vehicle

lawfully stopped were licensed to drive, the decision to impound the vehicle was reasonable given the safety threat posed by vehicles left on the side of the road, and the danger of vandalism to the vehicle itself were it left on the shoulder. The court affirmed the troopers' decision to impound the vehicle even though there were alternative and less intrusive means of dealing with the vehicle. See id.. The court stated, "[t]here is no requirement that the officers must select the least intrusive way of fulfilling their community caretaking responsibilities." Id.. The court went on to hold, "[w]here, as here, the police have solid, noninvestigatory reasons for impounding a car, there is no need for them to show that they followed explicit criteria in deciding to impound, as long as the decision was reasonable." Id. at 787; see also United States v. Dall, 608 F.2d 910, 913 (1st Cir. 1979) (impoundment reasonable where "it was the regular practice of the Rhode Island State Police to impound a vehicle in a variety of circumstances, including instances in which an out-of-state driver is stopped, cannot produce an operator's license or identification and is driving a vehicle that belongs to someone else.").

In the case at hand, the officers acted according to EPPD policy. That policy specifically provides,

> If, during the course of duty, an officer encounters a driver whose privileges to operate a motor vehicle have been suspended, revoked, or cancelled, the officer will charge the person under RIGL 31-11-18.... If the

> operator . . . is an out-of-state resident, an arrest should be made. . . . The vehicle will be towed or, with permission of the operator, turned over to a licensed operator.

Upon stopping the vehicle and discovering that the driver did not have a valid license, that the vehicle was a rental owned by Avis Rental Company and leased to the the defendant, who was arrested for possession of narcotics, the decision to tow the vehicle was not only reasonable, but in accordance with EPPD policy.

Despite this, the defendant asks the court to find that Patrolman Dubois should have released a rental vehicle, stopped in a construction zone on the side of Route 195 at 1:13 a.m., to another individual, despite the fact that the lessor of the vehicle was under arrest, the driver was operating the vehicle without a license and the third party in the vehicle, Simmons, had a Florida identification. Given that all three occupants were out-of-state residents, none of them were likely to have someone close by to whom the vehicle could be released. Furthermore, because the vehicle was a rental, Patrolman Dubois could not release the vehicle to anyone who was not on the rental agreement. In short, Patrolman Dubois's actions were eminently reasonable under the circumstances, as was the ensuing and uncontested inventory search.

**IV. THE STRIP SEARCH AND VISUAL BODY CAVITY INSPECTION OF THE DEFENDANT WAS LAWFUL. THUS, THE CRACK COCAINE DISCOVERED BETWEEN HIS BUTTOCKS SHOULD NOT BE SUPPRESSED.**

Officers need to have a "reasonable suspicion that a particular detainee harbors contraband prior to conducting a strip or visual body cavity search." Roberts v. Rhode Island, 239 F.3d 107, 110 (1st Cir. 2001); see also United States v. Cofield, 391 F.3d 334, 336-37 (1st Cir. 2004); United States v. Kenny Barnes, 2006 WL 1662934, at *3 (D.R.I. June 8, 2006) (slip copy). Moreover, "the reasonable suspicion standard may be met simply by the fact that the inmate was charged with a violent felony." Roberts, 239 F.3d at 112. "However, when the inmate has been charged with only a misdemeanor involving minor offenses or traffic violations, crimes not generally associated with weapons or contraband, courts have required that officers have a reasonable suspicion that the individual inmate is concealing contraband." Id..

In Barnes, the Court concluded that although the strip search was reasonable, "there was much less justification for taking the further step of conducting a visual body cavity search." Barnes, 2006 WL 1662934, at *4. The Court reasoned that marijuana was too bulky to conceal in the defendant's buttocks, and the fact that the marijuana was found in the trunk suggests that Barnes would not conceal an additional amount in a body cavity. See id..

The case at hand is distinguishable. Significantly, the drug in question in this case is crack cocaine, a narcotic that readily lends itself to concealment in the buttocks, especially within the buttocks of an individual the size of the defendant[4]. Additionally, Patrolman Gardner[5] was aware of the defendant's narcotics trafficking background prior to conducting the search. Furthermore, here, unlike in Barnes, the defendant was found with an additional narcotic, marijuana, in his pocket. See Cofield, 391 F.3d at 337 (recognizing that a glassine baggie of heroin found in the defendant's pocket increased the likelihood that he might have more heroin on his person).

In Barnes, the officers found used marijuana in the passenger area of the car, and in the trunk two larger bags of marijuana along with some scales. Unlike that case, this one involved an extremely large quantity of crack cocaine, over half a kilogram of crack, packaged for distribution in many tiny glassine baggies.

---

[4] The defendant stands 6'03" and weighs 200 pounds.

[5] Patrolman Gardner has nearly 12 years in law enforcement, including years as a correctional officer, a state marshal and a police officer. He has personally conducted thousands of strip searches, and performs each one in the same manner. He has personally recovered narcotics from the buttocks of drug dealers, and has been involved in an investigation where a firearm was recovered from a suspect's buttocks. Patrolman Gardner is familiar with narcotics trafficking, the techniques employed and the increased risk to officers when confronting a drug dealer due to the increased likelihood that the suspect will be armed.

It was certainly reasonable for officers familiar with narcotics trafficking to conclude that the defendant would have a retail portion of crack cocaine, namely 3 grams of it, readily available for distribution while his stash was stored in the trunk. This is especially true in light of the movements Patrolman Gardner observed the defendant engaging in prior to his removal from the vehicle.

Finally, Patrolman Gardner conducted this search in strict compliance with the EPPD policy governing such searches. The policy requires the officers to have "articulable, reasonable suspicion to believe the individual is concealing contraband and weapons." The policy also provides six factors that an officer should consider in determining whether that standard is met. Namely, the policy requires the officer to look at one or more of the following: the nature of the offense, the arrestee's appearance and demeanor, the circumstances surrounding the arrest, the criminal history of the arrestee, the evidence already discovered, and any suspicious objects beneath the suspect's clothing. In this case, as discussed above, each one of the six factors weighed in favor of a visual inspection of the defendant.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Honorable Court deny the defendant's Motion to Suppress Evidence.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U.S. Attorney
New York Bar
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (fax)
sandra.beckner@usdoj.gov

Certificate of Service

I hereby certify that on the 12th day of October, 2006, I caused a copy of the within Government's Response to be e-filed and served via e-file on Edward C. Roy, Assistant Federal Public Defender, 10 Weybosset Street, Suite 300, Providence, RI 02903.

/s/ SANDRA R. BECKNER
SANDRA R. BECKNER
Assistant U.S. Attorney
New York Bar
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5001 (fax)
sandra.beckner@usdoj.gov