UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
v. ) CR. No. 06-061S
KENT AWER, )
Defendant )

**Decision and Order**

WILLIAM E. SMITH, United States District Judge.

I.

Defendant Kent Awer is charged with Possession with Intent to Distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Before the court is Defendant's Motion to Suppress all evidence seized from Defendant's person and rental car. For the following reasons, the court grants Defendant's motion in part and denies the motion in part.

II.

On May 2, 2006, Officer Andrew Dubois of the East Providence Police Department ("EPPD") was alone on patrol going eastbound on Route 195.[1] Officer Dubois observed a Chevrolet Malibu driving between 68 and 71 miles per hour in the 50 miles per hour zone. At approximately 1:13 a.m., Officer Dubois activated his overhead lights in an effort to effectuate a traffic stop, but the Malibu

[1] The Court finds Officer Dubois's testimony credible.

continued driving for another half mile and changed lanes without signaling before pulling over.

When the Malibu finally stopped (in a construction zone), Officer Dubois exited his patrol car and approached the driver's side of the Malibu. Officer Dubois observed three individuals in the Malibu, including Defendant. The driver, Dianekqua Johnson, produced a Massachusetts medical card and told Officer Dubois she did not have a license. At the same time, Defendant, who was sitting in the front passenger seat, leaned over and told Officer Dubois that he had rented the car. Defendant did not produce his license, but did produce the rental agreement, which Officer Dubois read. Defendant also told Officer Dubois that they were traveling from New York City.

While Officer Dubois was speaking with the Malibu's occupants, Officer Floyd Gardner arrived as backup.[2] The officers ordered Johnson to step out of the Malibu and arrested her as an unlicensed out-of-state operator. As Officers Dubois and Gardner secured Johnson in Dubois's patrol car, they observed Defendant moving around in the Malibu's passenger compartment and, once Johnson was secured, they immediately approached the Malibu's passenger side. Officer Dubois noticed that Defendant was sweating profusely and breathing heavily. Officer Dubois asked Defendant to step out of the vehicle, but Defendant instead made a fast motion towards his

[2] The Court also finds Officer Gardner's testimony credible.

left side and the center console area. Officer Gardner instantly grabbed Defendant's right hand and pulled him from the vehicle.

As the officers pulled Defendant out of the Malibu, an item resembling a pack of rolling papers fell to the ground. As Defendant reached down to pick up the object on the ground, Officer Dubois ordered him to put his hands on his head. Instead of complying, however, Defendant moved his hand down toward his waist, which prompted the officers to secure Defendant's hands over his head. When asked by the officers whether he had anything illegal on his person, Defendant replied that he had marijuana in his pocket. Officer Dubois seized the marijuana and at 1:16 a.m. placed Defendant under arrest. The officers also asked the third passenger, Lashon Simmons, to exit the Malibu.

Officer Dubois then requested a tow truck pursuant to EPPD regulations. The officers also wanted to remove the Malibu from the highway because it was late at night and there was no breakdown lane. They had also learned there were no other licensed operators on scene; Simmons possessed only a Florida identification card.

Before the Malibu was towed, Officer Dubois conducted an inventory, again pursuant to EPPD inventory search regulations. In the Malibu's trunk were five unlocked duffle bags. After opening the bags, the officers discovered a large quantity of soap, clothing, candy, and a substance that would later be identified as cocaine base. The cocaine was packaged in a vacuum-sealed bag

containing numerous smaller, quarter-size bags of crack cocaine.

Officer Gardner took Defendant back to the police station. A criminal background check revealed that Defendant had prior drug charges. Accordingly, Officer Gardner performed a strip search and visual body cavity search of Defendant. When Officer Gardner asked Defendant to spread his buttocks, he observed what appeared to be a small glassine plastic bag similar to those found in the Malibu's trunk. Officer Gardner ordered Defendant to remove the bag, which Defendant did. Lab results later confirmed that the bag contained 3.2 grams of cocaine base, and that Officers Dubois and Gardner had seized 531.2 grams of cocaine base from the Malibu's trunk.

## Analysis and Conclusions of Law

In an effort to suppress the cocaine base found in the Malibu and on his person, Defendant argues that several aspects of his encounter with the police violated his Fourth Amendment rights. First, Defendant claims the police lacked probable cause to make the initial stop. Next, Defendant claims the police were not justified in removing him from the vehicle and frisking him. Defendant further argues that the police unlawfully impounded the Malibu. Finally, Defendant argues that Officer Gardner lacked reasonable suspicion to perform a visual body cavity search on him at the police station. The court addresses each argument in turn.

1. Was the Initial Stop of the Malibu Justified?

Defendant first argues that Officer Dubois lacked probable cause to pull over the Malibu, and that the stop was merely pretextual. The Government responds that Officer Dubois had probable cause to pull over the Malibu because he observed it speeding, and that Officer Dubois's subjective intentions are irrelevant.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Here, Officer Dubois observed the Malibu speeding at a rate eighteen to twenty-one miles per hour over the speed limit; his initial stop of the Malibu was therefore justified. See id. Moreover, whether Officer Dubois used the traffic violation as a pretext to search for narcotics is irrelevant: "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." See id. at 813. The court therefore finds no Fourth Amendment violation in the initial stop.

2. Did the Officers Have Adequate Suspicion to Remove Defendant from the Malibu?

Next, Defendant argues that Officers Dubois and Gardner lacked reasonable suspicion to remove him forcibly from the Malibu and that their use of force amounted to a de facto arrest. It is true that at some point, a lawful Terry stop may become a de facto

arrest, requiring probable cause. United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). However, there is no precise formula for determining whether a de facto arrest has occurred. United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998). The court considers, "among other factors, the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." Id. at 28. Essentially, the court asks whether "'a reasonable man in the suspect's position would have understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." Zapata, 18 F.3d at 975 (quoting Berkemer v. McCarthy, 468 U.S. 420, 442 1984)).

Despite this totality of the circumstances inquiry, it is not entirely clear whether an officer may forcibly remove a passenger who disobeys a lawful exit order without thereby transforming the investigatory stop into a de facto arrest. In Maryland v. Wilson, the Supreme Court established a per se rule that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." 519 U.S. 408, 415 (1997). In light of the "weighty interest in officer safety . . . the additional intrusion on the passenger is minimal." Id. at 413, 415. The Court expressly left open the question of whether an officer may forcibly detain a passenger for the duration of the stop. Id. at 415 n.3

("Maryland urges us to go further and hold that an officer may forcibly detain a passenger for the entire duration of the stop . . . Th[is] question . . . is not presented by this case, and we express no opinion upon it.").

Although the Supreme Court has not squarely addressed the issue left open in Wilson, it is clear that not every application of force transforms an investigatory stop into a de facto arrest. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). Thus, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. (internal quotations omitted). Factors relevant to this analysis include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Because "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation," an officer's use of force "must be judged

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396-97; see also United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997)(no de facto arrest where police officer observed a gun in defendant's pocket, lunged at defendant, and made brief contact); Gaudreault v. Municipality of Salem, 923 F.2d 203, 206 (1st Cir. 1990) (officers' use of force to restrain a suspect was reasonable where suspect resisted arrest by attacking the arresting officer, and officers never drew their weapons and did not cause any notable injury).

Viewed in context, the officers' use of force was reasonable and did not amount to a de facto arrest of Defendant. Officer Dubois had stopped the Malibu in the middle of the night on an empty highway. As he and Officer Gardner were securing the driver, Johnson, they observed Defendant making suspicious movements in the front seat. Most importantly, however, Defendant disobeyed a lawful exit order and instead made a furtive movement towards the center console. See Wilson, 519 U.S. at 415 ("[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). Because the officers had very little information about Defendant and did not know whether he was in fact reaching for a hidden weapon, Defendant's furtive movement forced the officers to make a "split-second judgment[] - in circumstances that [were] tense, uncertain, and rapidly evolving." See Graham, 490 U.S. at 397. Additionally, the officers' use of force was

fairly limited and quick; they grabbed Defendant by one hand and used just enough force to get him out of the vehicle. See Young, 105 F.3d at 8. There is no indication that their use of limited force injured Defendant. See Gaudreault, 923 F.2d at 206.

Defendant relies heavily upon United States v. McKoy to suggest that his nervousness and movements in the car did not justify the officers' use of force. 428 F.3d 38, 40-41 (1st Cir. 2005). Strictly speaking, in McKoy the First Circuit Court of Appeals held that officers could not frisk a defendant stopped for a motor vehicle equipment violation merely because he was nervous and was driving in a high-crime area. The court recognized that nervousness is a common feeling of someone whom the police have stopped, and that "there was nothing sinister or menacing about [the Defendant's] reaching movement toward the center console." Id. at 40. Thus, for the First Circuit, legitimizing such a standard would come "too close to allowing an automatic frisk of anyone who commits a traffic violation in a high-crime area." Id. at 40.

Here, however, Defendant attacks not the frisk, which was predicated on his own admission of marijuana possession,[3] but his removal from the Malibu. In this respect, McKoy is easily

---

[3]Defendant's statement to the officers provided probable cause upon which the officers could arrest Defendant and perform a search incident to arrest. See Chimel v. California, 395 U.S. 752, 763 (1969) ("[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").

distinguishable. The concerns motivating the court in McKoy, namely that allowing frisks based merely on nervousness and potentially innocuous movement would authorize automatic frisks and render the reasonable suspicion necessary for Terry stops nugatory, are not implicated in situations where the same behavior follows a lawful exit command. Insofar as Officers Dubois and Gardner did not frisk Defendant based on his nervousness and movement to the console, but rather effectuated their lawful order to exit the Malibu based on Defendant's disobedience and quick grab toward the center console, their use of force was justified based on reasonable suspicion and was not impermissible. See Graham, 490 U.S. at 396.

Moreover, after considering the officers' use of force in light of the remaining factors, such as Defendant never being told he was under arrest, see Young, 105 F.3d at 8, or never being placed in handcuffs, see Tom v. Voida, 963 F.2d 952, 958 (7th Cir. 1992), the court concludes that the use of force was insufficient to cause a "'reasonable man in the suspect's position'" to believe he was under arrest. See Zapata, 18 F.3d at 975 (quoting Berkemer, 468 U.S. at 442).

3. Could the Officers Lawfully Impound the Malibu?

Defendant next argues that after the officers arrested him, they were obligated to turn the Malibu over to a third party rather than impound it. Defendant contends that EPPD lacks a standardized

impoundment policy and that the officers therefore acted with unbridled discretion. Contrary to Defendant's suggestion, EPPD does have a formal towing policy, and the court is convinced that the officers acted reasonably in towing the Malibu.

Under the community caretaking function, officers have the authority "to remove vehicles that impede traffic or threaten public safety and convenience," even if they lack a warrant to seize the car. United States v. Coccia, 446 F.3d 233, 238 (1st Cir. 2006)(citing South Dakota v. Opperman, 428 U.S. 364, 369 (1976)("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.")). Impoundments made pursuant to a standard procedure are "most likely" to satisfy the Fourth Amendment. Id.; see also Vega-Encarnacion v. Babilonia, 344 F.3d 37, 41 (1st Cir. 2003)("[L]aw enforcement officials are not required to give arrestees the opportunity to make arrangements for their vehicles when deciding whether impoundment is appropriate.").

Several factors demonstrate that the officers' decision to impound the Malibu was reasonable. First, under Coccia the officers' compliance with EPPD impoundment procedures is strong evidence that their decision was reasonable. See 446 F.3d at 238 ("[W]e read [Colorado v. Bertine, 479 U.S. 367 (1987)] to indicate that an impoundment decision made pursuant to standardized procedures will most likely, although not necessarily always,

satisfy the Fourth Amendment."). Second, Vega-Encarnacion forecloses Defendant's argument that the officers' failure to turn over the Malibu to a third party rendered their decision unreasonable; at any rate, the rental agreement prohibited a third party from driving the Malibu. See 344 F.3d at 41. Finally, each officer testified it would have been dangerous to leave the Malibu on the side of the highway. Their decision to impound the Malibu, which if left on the side of the highway would likely "impede traffic or threaten public safety and convenience," is therefore "beyond challenge." See South Dakota v. Opperman, 428 U.S. 364, 369 (1976); Coccia, 446 F.3d at 238. Under these circumstances, then, the officers' decision to impound the Malibu was eminently reasonable.[4]

4. Was Officer Gardner's visual body cavity search of Defendant justified?

Defendant's final challenge is that the visual body cavity search Officer Gardner performed on him was unlawful because Officer Gardner lacked the requisite reasonable suspicion.[5] The

---

[4]Defendant does not challenge the subsequent inventory search of the Malibu. Consequently, the Court will not address the validity of the search.

[5]The government concedes that Officer Gardner performed a visual body cavity search, not merely a strip search, of Defendant. See Roberts v. Rhode Island, 239 F.3d 107, 108 n.1 (1st Cir. 2001) ("A 'strip search' involves a visual inspection of the naked body . . . . A 'visual body cavity search' is a strip search that includes the visual examination of the anal and genital areas.") (quoting Security & Law Enforcement Employees v.

Government contends that Officer Gardner had reasonable suspicion based on his experience and the nature of Defendant's offense. The Government also argues that Officer Gardner performed the search in "strict compliance with" departmental guidelines.

Though arresting officers may ordinarily perform a search incident to arrest, visual body cavity searches "impinge seriously upon" an individual's privacy, and consequently require greater justification. Swain v. Spinney, 117 F.3d 1, 6-7 (1st Cir. 1997). The constitutionality of a visual body cavity search therefore depends on "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell v. Wolfish, 441 U.S. 520, 559 (1979). In the context of arrests, officers must have at least reasonable suspicion that a particular defendant is concealing contraband or a weapon before a visual body cavity search may be conducted. Swain, 117 F.3d at 6.

Employing a balancing test to determine the reasonableness of a visual body cavity search, the Court of Appeals for the First Circuit in Swain found two factors weighing against its propriety. First, "further delay to obtain a warrant would not have significantly increased the risk of destruction" of concealed evidence. Id. at 8. Second, institutional security concerns could not justify the search; even though the defendant, "a narcotics

---

Carey, 737 F.2d 187, 192 (2d Cir. 1984)).

suspect, might have been carrying a concealed weapon, [the officer] did not assert that [the defendant] posed a threat to his safety or that of others in the police station." Id. Finally, the court noted that although the defendant had dropped a small bag of marijuana before she was arrested, "[n]othing in the record suggest[ed] that [the defendant] was suspected of being a distributor of marijuana." Id. at 9. Thus, even though Swain "may have possessed some unspecified amount of marijuana," the court found that this fact alone could not establish reasonable suspicion. Id.

Here, Officer Gardner testified that cocaine packaged in small bags could be concealed in a person's buttocks. Similarly, on one past occasion Officer Gardner discovered a small-caliber firearm hidden in a prisoner's body cavity. Moreover, there was evidence that Defendant was a distributor of crack cocaine. The Government also contends it would be reasonable to expect someone associated with narcotics trafficking to stash a "retail portion" on his body.

Nevertheless, these reasons do not amount to reasonable suspicion. Officer Gardner did not testify to any immediate need for the visual body cavity search. As in Swain, "further delay to obtain a warrant would not have significantly increased the risk of destruction" of concealed evidence. Id. at 8; see also United States v. Barnes, 443 F.Supp.2d 248, 253 (D.R.I. 2006) ("While it is possible that a person who sells marijuana also might sell other

controlled substances that would be more readily concealed in bodily cavities, something more than mere possibilities are required to support reasonable suspicion.").

Moreover, Officer Gardner's one-time discovery of a concealed firearm hidden between a prisoner's buttocks does not justify a body cavity search of every defendant. The officers found no guns in the Malibu, on Defendant's person when they frisked him, or on either of the Malibu's other occupants. If anything, the fact that Officer Gardner has performed "hundreds" of visual body cavity searches with only one resulting in the discovery of a hidden firearm suggests the safety concern is not strong, particularly in circumstances where no other factors are present which would create a suspicion that drugs or a weapon may be concealed. Officer security considerations - "the most compelling justification for warrantless strip and visual body cavity searches" - could therefore not justify the visual body cavity search. See Swain, 117 F.3d at 8.

The court therefore holds that Officer Gardner lacked sufficient particularized suspicion to perform a visual body cavity search of Defendant.[6] See id. at 6. The court does not wish to undervalue the importance of body cavity searches to officers' safety or investigative functions; but to hold otherwise would be

---

[6] The Government has not argued that the bag of crack cocaine would have been inevitably discovered.

to entitle the police to an automatic body cavity search of every person arrested for a non-violent drug offense. See id. at 7 ("[V]isual body cavity searches are not routine, and must be carefully evaluated."). In this case, there simply was no particularized suspicion that Defendant was secreting drugs, and, therefore, the search was impermissible.

As a final note, the Court disagrees with the Government that Officer Gardner conducted the body cavity search in "strict compliance" with EPPD policies. The six factors referenced in the government's brief apply to strip searches, not body cavity searches. Moreover, the department's policies do not distinguish between a visual body cavity search and a manual cavity search. See Blackburn v. Snow, 771 F.2d 556, 561 n.3 (1st Cir. 1985) (unlike a visual body cavity search, a "'manual body cavity search' includes some degree of touching or probing of body cavities."). As this case illustrates, these are substantial distinctions. Given that this is not the first time evidence seized pursuant to a visual body cavity search has been suppressed, see e.g. Barnes, 443 F.Supp.2d at 253-254, more complete and accurate policies to govern this sensitive, yet crucial, area of investigatory searches are required.

## Conclusion

Officers Dubois and Gardner violated Defendant's Fourth Amendment rights only with respect to the visual body cavity

search. Therefore, the court GRANTS Defendant's Motion to suppress the evidence seized during the visual body cavity search, and DENIES Defendant's motion to suppress the evidence seized prior to the visual body cavity search.

IT IS SO ORDERED.

William E. Smith
United States District Judge
Date: 1/22/07