EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

| | |
|---|---|
| USA | CRIMINAL ACTION 06-061S |
| VS. | JUNE 27, 2007 |
| KENT AWER | PROVIDENCE, RI |

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(TESTIMONY OF KARL JACOBSON)

APPEARANCES:

FOR THE GOVERNMENT: SANDRA BECKNER, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: EDWARD C. ROY, ESQ.
Federal Public Defender's Office
10 Weybosset St.
Providence, RI 02903

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

# I N D E X


| WITNESS | PAGE |
|---|---|
| KARL JACOBSON | |
| Direct Examination by Ms. Beckner: | 3 |
| Cross-Examination by Mr. Roy: | 27 |
| Redirect Examination by Ms. Beckner: | 31 |
| GOVERNMENT EXHIBITS | |
| 4 - | 16 |
| 7 & 7A - | 19 |
| 10 - | 17 |
| 12 - | 15 |
| 12A - | 15 |

**KARL JACOBSON**, first having been duly sworn, testified as follows:

THE CLERK: Please state your name and spell your last name for the record.

THE WITNESS: Karl Jacobson, J-A-C-O-B-S-O-N.

**DIRECT EXAMINATION BY MS. BECKNER**

Q. Officer Jacobson, where do you work?
A. New Haven Police Department.
Q. How long have you worked there, sir?
A. Since February of '07.
Q. Prior to working for the New Haven Police Department, where did you work?
A. I was with the East Providence Police Department for nine years.
Q. What sections of the East Providence Police Department were you assigned to?
A. I was assigned to the narcotics unit for several years and the DEA Drug Task Force for several years.
Q. Prior to being assigned to the narcotics unit, where were you assigned?
A. The Patrol Division.
Q. How long did you work in patrol, sir?
A. A little over four years.
Q. During that period of time, how many motor vehicle stops were you involved in?

A. Over six thousand.
Q. How often did you conduct a motor vehicle stop in which you found narcotics?
A. Hundreds of times.
Q. Now, you said you worked with the narcotics unit in the East Providence Police Department. What type of work did you do when you were working with their unit?
A. We did long- and short-term drug investigations, street level, mid-level dealers, higher dealers. I've performed undercover buys, all different facets of the drug investigations.
Q. What sort of training did you receive as it relates to narcotics?
A. I've been to two police academies. I've been to DEA two-week school where it's put on by the Drug Enforcement Agency. Several highway interdiction schools, I believe I went to four of those which were three days each, which taught you how to conduct motor vehicle stops. All different -- a couple other DEA schools for specific drugs such as crack cocaine or illicit drugs such as Rave drugs or all different type schools where we learned different methods of -- modes of transportation by drug dealers, different methods drug dealers used in each facet of their transportation, say for motor vehicles explicitly.

Different things people would do like have females and children in the car to avoid detection, rent cars so their vehicles wouldn't be seized, used masking agents such as detergent or soap to cover the smell for K-9 detection, all different kind of activities such as that.
Q. Now, how many years did you say you were actually on the DEA task force?
A. Approximately three.
Q. While you were on the DEA task force, how many drug cases do you think you worked on?
A. Hundreds of drug cases.
Q. And how about when you add in your experience at the East Providence Police Department, what do you think the total number of drug cases are that you've worked on?
A. Be close to a thousand.
Q. What percentage of those cases do you think involved cocaine, either powder or crack cocaine?
A. Be about 60 percent of those cases would have been.
Q. Now, what kind of cases do you actually work while on the DEA task force as opposed to say on the narcotics unit of the East Providence Police Department?

MR. ROY: Objection. Relevance, your Honor.

MS. BECKNER: This goes to foundation, your Honor.

THE COURT: I'm going to allow the question. Overrule the objection. Go ahead. You may answer.

A. We did several wiretap investigations where we did long-term surveillance of narcotics, mid-level dealers, higher dealers. Things such as that.

Q. Now, through your experience with DEA, have you learned what code is?

A. Yes. Through the listening to the cellphones through wiretaps, we had in-depth experience with coded language for drug dealers.

Q. So you're familiar, then, with like street terminology and the words used in the drug business?

A. Yes.

MR. ROY: Objection. Leading, your Honor.

THE COURT: Sustained.

MR. ROY: Move to strike.

THE COURT: Strike the answer. Disregard the answer to the previous question. Please don't lead the witness, Ms. Beckner.

MS. BECKNER: Yes, your Honor.

Q. What kind of information can you learn from listening to drug conversations?

A. Like I mentioned before, the different modes of transportation, the different ways that they conceal narcotics, the different ways of not having their valuables seized along with the narcotics.
Q. Sir, have you ever executed search warrants?
A. Yes.
Q. Have you ever conducted a vehicle search?
A. Yes.
Q. How many searches do you think you've conducted in which narcotics have been seized?
A. Hundreds.
Q. Now, what types of items are seized during a narcotics search warrant?
A. Different items such as the narcotics themselves. If there are -- if it's a situation where they're a user who is selling, you'll find paraphernalia where they use like a pipe or a needle or whatever they use the narcotics with, they will have. If they're just dealing, like a mid- to higher level dealer where they're not using, you won't find any of that paraphernalia. You'll find bagging material, scales. The items will be individually bagged for sale, that type of stuff.
Q. What's a common mode of communication in the drug world?

A. Cellphone.
Q. Sir, you mentioned that you've worked undercover. What exactly does that mean?
A. I changed my appearance and went on the street level and purchased narcotics on the street level.
Q. What kind of drugs have you purchased?
A. Heroin, crack, powder cocaine, marijuana, Ecstasy. I think that's about it.
Q. How many times do you think you've worked undercover?
A. In an undercover capacity, close to a hundred. I think I've done over 60 some odd buys.
Q. Now, when you're working undercover, who are you directly interacting with?
A. That's more of a street level dealer where I'm actually playing a user and maybe buying $20 increments or smaller increments.
Q. Have you ever played a dealer?
A. Yes, bought a larger amount. More of a mid-level dealer.
Q. Have you ever conducted surveillance, sir?
A. Yes.
Q. What types of drug activities have you observed while conducting surveillance?
A. Pretty much every type of drug activity from the

user looking to purchase off the street, the mid-level dealer going to an upper level dealer and what kind of exchanges they do. Pretty much all types.
Q. Have you ever surveyed other officers who are working undercover?
A. Yes.
Q. How about informants?
A. Yes.
Q. Sir, have you conducted interviews with cooperators and with defendants within the drug world?
A. Yes. That's a common tool for us, because we can only learn about different methods by talking to the people who do it and why they do it. So by talking to informants or defendants, they can actually say, well, you know, they give us different modes of transportation and what they try to do and how they actually bag the material, what the street level value is.
Q. Now, in addition to talking to the individuals directly involved in the drug world, who else do you exchange information with?
A. Other law enforcement agents and officers. Pretty much anyone involved in the different types of situations.
Q. Based upon all of the above, Officer Jacobson,

have you obtained a good working knowledge of the methods and operations used by drug dealers?
A. Yes.
Q. Have you obtained a good working knowledge of the equipment used by drug dealers?
A. Yes.
Q. The equipment used by users?
A. Yes.
Q. About the tactics that are used to avoid detection?
A. Yes.
Q. Have you obtained a good working knowledge of the physical appearance of controlled substances?
A. Yes.
MR. ROY: Objection. Again, leading, your Honor.
MS. BECKNER: This is foundational, your Honor.
THE COURT: I'm going to allow it. Overruled.
Q. How about price? Have you obtained a good working knowledge of the price of controlled substances at different levels in the drug chain?
A. Yes. Through the interception of the phones and listening to the costs of stuff on phone taps as well as talking to the defendants, talking to the informants, and as well as actually buying it myself.

Q. Have you ever testified as an expert in Federal Court before?
A. Yes.
Q. How many times?
A. Twice.
Q. Have you ever testified in state court?
A. Yes.
Q. Have you ever testified based upon your experience in state court?
A. Yes.
Q. Sir, what is cocaine base?
A. Cocaine base is a form of cocaine, which street we call it crack, which is cocaine powder is taken and it's cooked with baking soda. And what it does is it turns into a rock-like form. This gives the user a greater high, and it also gives the seller a better price for it.
Q. What did you say the street name of it was?
A. Crack.
Q. What are some street names for powder cocaine?
A. Well, you could call it soft where the powder cocaine is soft, the crack cocaine is hard. You call it cold with the powder is cold, the crack being cooked is hot. There's all different types of names.
Q. How is crack cocaine ingested in the body?

A. It's normally smoked.
Q. What is used to smoke it?
A. Normally, a glassine pipe or some type of pipe with a copper material as a filter.
Q. What quantity of crack cocaine is typically sold to the end user?
A. Anywhere from point 2 to point 5 grams.
Q. And what would point 2 grams of crack cocaine cost?
A. About $20.
Q. Now, could you just describe for me what would be the equivalent of a gram to kind of put it in perspective?
A. A gram would be like a Sweet-and-Low packet, a sugar packet. That's about a gram.
Q. So point 2 of that would be about $20?
A. Yes, ma'am.
Q. Now, sir, how is crack cocaine packaged for distribution at the lowest level, at the street level?
A. It would be broken up into smaller packages, say like a point 2 package, or a common denomination would be what's called an eight-ball, which is 3.5 grams.
Q. What happens to the price per gram of crack cocaine as you buy it in larger quantities?
A. The price goes down if they're buying in a larger

quantity.
Q. Officer Jacobson, what was your involvement in the investigation of the defendant, Kent Awer?
A. I was notified the morning of his arrest, and I seized the narcotics.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Sir, I'm handing you what's been previously marked as Government Exhibit 12. Do you recognize that?
A. Yes, I do.
Q. What is it?
A. It's the crack cocaine from the defendant's case.
Q. Now, when you retrieved it from the East Providence Police Department, what did you do with that crack cocaine?
A. I removed it from a bag and then photographed it, weighed some of it, got weights on it, and I field-tested it.
Q. What's a field test?
A. It's a small test kit where we can determine if there's drug presence inside the drugs or the packages.
Q. Have you performed these field tests prior to May 2nd, 2006?
A. Yeah. Probably over a thousand field tests.

Q. What was the result of your field test, Officer Jacobson?
A. I tested a couple of samples, and they tested positive for the presence of cocaine.
Q. So now, after you received these drugs from the East Providence Police Department, what did you do with them?
A. I packaged them and sent them to the New England Field Division Lab for the DEA.
Q. How is it that you packaged them to send them to the laboratory for testing?
A. Very similar to this. This is my name on here with the seal from when I sent them.
Q. And what's done to the actual package to make sure that the lab can tell it hasn't been tampered with?
A. It's heat-sealed on the top with a sticker stating my name. It's still intact.
Q. So Exhibit 12 is what you sent to the DEA laboratory for testing; is that right?
A. Yes, ma'am.
Q. And did you get the results of that laboratory testing back?
A. Yes.
MS. BECKNER: Your Honor, at this time I would move to admit Government Exhibit 12A in full by

stipulation.

MR. ROY: No objection, your Honor.

THE COURT: All right. 12A will be admitted in full and you may read that to the jury.

(Government Exhibit 12A marked full.)

MS. BECKNER: Yes, your Honor. The United States of America and the defendant hereby stipulate and agree that if Mrs. Ramona Montreal, a forensic chemist with the Northeast Regional Laboratory of the U.S. Drug Enforcement Administration, were called as a witness, she would testify that the narcotics marked as Government Exhibit 12 contain cocaine base and have a net weight of 531.2 grams.

At this time the Government also moves that Government Exhibit 12 be admitted in full.

THE COURT: Any objection, Mr. Roy?

MR. ROY: None, your Honor.

THE COURT: Twelve will be full.

(Government Exhibit 12 marked full.)

Q. Now, Officer Jacobson, do the drugs as they are now, do they look just as you saw them on May 2nd, 2006?

A. No. It appears they were removed from the packaging. You know, it's been a while so -- they look a little different.

Q. Would you flip in your exhibit book up there to Government Exhibit 4. Do you recognize that, sir?
A. Yes.
Q. What is it?
A. This is a picture taken of the drugs immediately after, I believe, the same day of the arrest.
Q. Does that picture fairly and accurately describe the way the drugs looked when you arrived at the East Providence Police Department?
A. Yes.
MS. BECKNER: Your Honor, at this time I move Government Exhibit 4 into evidence.
THE COURT: Any objection?
MR. ROY: No objection, your Honor.
THE COURT: Four may be admitted in full, and you may publish that to the jury.
(Government Exhibit 4 marked full.)
MS. BECKNER: Thank you, your Honor.
Q. Can you see that, Officer Jacobson?
A. Yes.
MS. BECKNER: May I approach the clerk, your Honor?
THE COURT: Yes.
Q. Officer Jacobson, if you could flip in your book to Government Exhibit 10. Do you recognize that, sir?

A. Yes.
Q. What is it?
A. That's the outside plastic taken off the drugs so you have the individual bags.
Q. And does that photograph, Government Exhibit 10, fairly and accurately depict the crack cocaine as it looked once you removed the vacuum-sealed package?
A. Yes. That was the drugs.
MS. BECKNER: Your Honor, at this time I'd move Government Exhibit 10 into evidence.
THE COURT: Any objection?
MR. ROY: No objection, Judge.
THE COURT: Government 10 may be full. You may publish that to the jury.
(Government Exhibit 10 marked full.)
Q. Officer Jacobson, can you see that on your screen?
A. Yes.
Q. And what do you notice about the way the drugs are packaged in this particular situation?
A. They're packaged individually in different increments. There was 112 separate bags, and the weight went from 1.7 to 7 grams, all varying weights.
MS. BECKNER: May I approach the clerk, your Honor?
THE COURT: Yes.

Q. Did you issue any subpoenas for documents in this case, Officer Jacobson?
A. Yes, I did.
Q. And what did you subpoena?
A. The records from the rental company, the rental car.
MS. BECKNER: May I approach the witness, your Honor?
THE COURT: Yes.
Q. Do you recognize that, Officer Jacobson?
A. Yes.
Q. What is it?
A. This is the response to the subpoena.
Q. And what company did you subpoena, sir?
A. Avis.
MS. BECKNER: Your Honor, at this time, the Government would move to admit Government Exhibit 7 and 7A, the stipulation into evidence.
THE COURT: Is there any objection, Mr. Roy?
MR. ROY: There's no objection, your Honor.
THE COURT: All right. Then Government 7 will be full. Do you wish to publish that to the jury?
MS. BECKNER: Yes, your Honor.
THE COURT: Why don't you read the stipulation to the jury and then publish the Exhibit 7 to the jury.

(Government Exhibit 7 and 7A marked full.)

MS. BECKNER: Yes, your Honor. The United States of America and the defendant hereby stipulate and agree that Government Exhibit 7, the Avis Rent-A-Car System, Incorporated agreement, number 674183716 is a true and accurate copy of the business records of Avis Rent-A-Car and is admissible into evidence.

This is the first page of Government Exhibit 7. This is the second page of Government Exhibit 7. This is the third page of Government Exhibit 7, the fourth page, the fifth page, and the final page of Government Exhibit 7.

THE COURT: This probably would be a good time to break before you move into another area.

So ladies and gentlemen, we're making very good progress in terms of the presentation of the evidence in this case. It's going very smoothly and quickly. I'm certainly pleased with that. I'm going to recess now for a lunch break. We'll reconvene at two o'clock as I told you before, because I have to deal with some other matters that can't wait. And in the meantime, just let me reemphasize to you at this point, the trial started, you've heard testimony. You obviously are gaining knowledge about the case. I want to

reemphasize some of the things I told you at the very beginning of the case.

First of all, not to discuss anything about the case with anyone,including your fellow jurors, until you begin your deliberations. There's very good reasons for that. Two of you have a conversation about the case, and you might influence each other in how to think about it. All jurors should be privy to anything you think or have to say about the case, and that's why we reserve any discussion of the case until you're all in the room together, because the entire jury has to act as a single body, and everyone is entitled and must hear what you have to say, just as you want to receive anything that any of your fellow jurors think or want to say about the case.

So you need to hold any thoughts, opinions, et cetera about the case until you're in the room deliberating.

Secondly, just a practical thing. This is a small town. If you're out and about on the street, you see someone associated with this case, someone who's testified or an attorney or anyone like that, they're going to walk the other way. They're going to cross the street. They're not trying to insult you. They just know that the rules of the game are that you are

absolutely off limits. Okay? So don't be offended if somebody appears to move away from you out on the street if you're out having a sandwich or something like that.

Don't expose yourself to anything related to this case in any way, as I told you, and we will be back in session at two o'clock.

All right. Charlie, you may show the jury out. Thank you.

(Proceedings out of the presence of the jury as follows:)

THE COURT: All right. You seem to be making very good progress in the timing of this case. You'll probably be through with it by three o'clock, I would guess.

MS. BECKNER: I imagine so, your Honor.

THE COURT: All right. Then you'll have your cross-examination of this witness. Will you be prepared to present evidence this afternoon?

MR. ROY: The subpoena for Lieutenant Mullensky is down for tomorrow, your Honor, and the same thing with Lynn Simas, the writ of habeas corpus had it tomorrow. I could check over the lunch break, because he's a lieutenant at the ACI, a supervisor, it may be hard to break him away. I'll make an effort though.

THE COURT: How much more do you think you have, Ms. Beckner?

MS. BECKNER: I actually think I have less than 30 minutes, your Honor.

THE COURT: Why don't you check over the lunch hour.

MR. ROY: As far as Lynn Simas, I would need a marshal to check the afternoon.

THE COURT: Will you all check into that?

THE MARSHAL: We will, your Honor.

THE COURT: See if we can do that. I think it's real possible we can finish all the testimony today. Give you overnight to finish your closing, do your closings, charge the jury and the jury could have the case by mid-morning. That would be good if we could do it. Also, in light of that, I think we should plan on a charge conference at the end of the day today. So when we finish testimony, I'll take you all upstairs and we'll do the charge conference. I don't figure that will take very long. Okay. See you at two o'clock.

(Lunch recess.)

(Proceedings in the presence of the jury as follows:)

THE COURT: Welcome back, ladies and gentlemen.

I hope you survived the heat. And ready to proceed with the examination, Ms. Beckner?

MS. BECKNER: Yes, your Honor.

THE COURT: All right. Go ahead.

**BY MS. BECKNER**: (Continuing)

Q. Officer Jacobson, are you familiar with the evidence seized in this case?

A. Yes.

MS. BECKNER: May I approach and retrieve Exhibit 12, your Honor?

THE COURT: Yes.

Q. Officer Jacobson, knowing that Government Exhibit 12, the crack cocaine seized in this case, has a net weight of 531 grams, do you have an opinion as to whether this quantity of crack cocaine is consistent with personal use or distribution?

A. Well, there's a couple of factors in that. If we can refer to Exhibit number 10, the picture.

THE COURT: First of all, do you have an opinion?

THE WITNESS: Yes, sir.

Q. What is your opinion, Officer Jacobson?

A. That it's for distribution.

Q. What do you base your opinion on?

A. Like I was saying, if we could look at Exhibit

number 10, the picture of the individually packaged narcotics, there's a few factors.

MS. BECKNER: Let me stop you for a second. Could I retrieve that exhibit, your Honor?

THE COURT: Yes.

Q. Can you see that on your screen, Officer Jacobson?

A. Yes.

MS. BECKNER: And that's on the jury's screen as well.

A. There's a few factors that go into this. One is the weight, 531 grams, the value of the weight of that much crack cocaine, the fact that the officers didn't find any paraphernalia for use such as pipes or anything that the defendant could use to use this quality of -- this crack cocaine at all, never mind any quantity. There was no use, evidence of use. And the fact that it's packaged in different increments, and you can sell this from, like I said, they weighed from 1.7 grams to 7 grams because you're selling the product at different weights so you can get different prices for them.

Q. How many bundles of crack would you say were contained within that one vacuum-sealed pack?

A. 112.

Q. And what did you say that the weights ranged from?

A. I'm sorry. 1.3 grams to 7 grams, I believe.
Q. Now, what does it mean in the drug world to talk about wholesale value?
A. Well, wholesale value might be a high-level drug dealer selling to a mid-level drug dealer where they're going to sell -- you get a better price, because you're buying it in bulk. You're going to sell it maybe already pre-cooked or we call it raw, if it's just powder and then it's cooked into crack. There's different factors such as that, but that would be wholesale.
Q. And what does it mean to say retail value?
A. Retail would be if you took the crack and even broke it down further to maybe we mentioned before point 2 gram increments would be $20. So at point 2 gram increments, this amount of crack cocaine could be up to about $50,000.
Q. What would be a wholesale value, say you were going to sell this whole quantity at once?
A. If you sold it like this where it's all bagged up and ready to go, it could be anywhere from 20 to 30,000, I would say, if you sold it from like a higher level dealer to a mid-level dealer. But if the mid-level dealer broke it down even further it could be worth, like I said, as high as 50,000.

Q. Now, based on your experience and training, have you become familiar with how narcotics are transported?
A. Yes.
Q. And based on your experience and training, what steps do narcotics traffickers take to avoid detection by law enforcement when they're transporting drugs?
A. I mentioned a few of them earlier. One would be the use of a rental vehicle. A, because you can use that vehicle in different neighborhoods where you know that narcotic officers are targeting, maybe looking for certain vehicles. And if we as the agents and officers checked those plates, they come back to rental vehicles. They don't come back to any targets. You don't know who's in the neighborhood. That's one method.
The other method for a rental vehicle would be so that it doesn't get seized, because your vehicle can be seized if you're moving this type of weight.
Q. What other steps do narcotics traffickers take to avoid detection when they're transporting narcotics?
A. Well, transporting in a situation like a highway situation where you may encounter K-9s in the highway, different type of officers train for that. So you're going to put masking agents such as soap, or fabric softeners, those type of things in with the drugs.

MS. BECKNER: May I have just a moment, your Honor?

THE COURT: Yes.

MS. BECKNER: I have no further questions.

THE COURT: Thank you, Ms. Beckner. Mr. Roy?

MR. ROY: Thank you, your Honor.

**CROSS-EXAMINATION BY MR. ROY**

Q. Good afternoon, Officer Jacobson. I believe you stated on direct examination, sir, and correct me if I'm wrong, that over the years you've gained a great deal of information based on your interviews with informants?

A. Yes.

Q. How many times have you interviewed informants?

A. Upward of a hundred or more.

Q. Okay. What's a free talk?

A. What's a free talk?

Q. Yes.

A. When it -- say a defendant sat down with counsel, and they have the opportunity to maybe help themselves out by giving information.

Q. You don't need to have counsel present, do you?

A. No, sir. Well, no. You normally do have counsel present.

Q. You're not required to have counsel present to

Q. You're not required to have counsel present to have a free talk, correct?
A. Not if they waive their rights.
Q. Right. And how do you set that up?
A. Depending on the point in the case that it is, normally through the attorneys.
Q. What if they don't have an attorney yet?
A. Through a waiver of rights, you could do that.
Q. Would you agree with me, Officer Jacobson, that if you wanted someone to give information, there's a need on behalf of law enforcement to assure the potential informant that the information they give won't be used against them?
A. Not necessarily. There's plenty of confidential informants who are willing to give information.
Q. That's going to hurt them?
A. I don't understand the question.
Q. What I'm saying is if you, as a law enforcement officer, wanted someone to give information, isn't it true that you have a need to assure that person that the information they give you won't be used against them?
A. Not in all cases, because there's people that come forward who want to be confidential informants and paid confidential informants.

Q. What about someone that's been arrested? Isn't there a need if they're going to give you information that you want to assure them that information is not going to be used against them?

A. Not necessarily. If they waive their rights, then they know it can be used against them.

Q. But don't you want to ensure -- in other words, if you tell a person, Let's sit down and talk, but everything you tell me I'm going to use against you, that person won't give you any information, will they?

A. That's not a common practice I would use.

Q. Because you wouldn't get any information out of that person, correct?

A. No, because I wouldn't use it. They would either waive their rights or have an attorney or be willing to talk. I'm not going to tell them to talk and I won't do anything to them. Do you understand? If they're a defendant, if they're a direct defendant.

Q. If they're a direct defendant and you want to get information out of them, you have to assure that person that the information they give you is not going to be used against them?

A. Not necessarily. If they waive their rights, then it could be used against them.

Q. Now, if you're talking with an informant, and you

told the informant that the information they give you was going to be used against them, that informant would never give you information, would they?

A. That's not necessarily true.

Q. In this case, there was a Prada bag seized, right?

A. Yes, sir.

Q. Was that bag fingerprinted?

A. No, sir.

Q. There was a glassine bag you have in front of you that the crack cocaine was stored in. Was that fingerprinted?

A. No, sir.

Q. Now, you mentioned raw cocaine before when you talked about the drugs that were seized in this case. What is raw cocaine?

A. Powder cocaine.

Q. And it has to be cooked by someone to convert it to crack cocaine, correct?

A. Yes, sir.

Q. Who cooked that crack cocaine that you have in front of you, do you know?

A. I believe the defendant stated he got it raw, so he must have cooked it.

Q. How do you know that he cooked it, though?

A. Because it's cooked, and he said he got it raw.

Q. Couldn't someone else have cooked it other than the defendant?
A. Oh, yeah, possibly.
Q. Did the defendant state that he cooked it?
A. I wasn't there present for the interview.
Q. You're familiar with the case, aren't you?
A. Yes.
Q. And you're the Government's expert?
A. Yes.
Q. Did the defendant state that he cooked that cocaine?
A. Not to my knowledge, no.
Q. Did the defendant state that he purchased raw cocaine?
A. Yes.
MR. ROY: That's all I have, sir. Thank you.
THE COURT: Redirect?
MS. BECKNER: Yes, your Honor.

**REDIRECT EXAMINATION BY MS. BECKNER**

Q. Officer Jacobson, you were the one that sent the evidence to the DEA laboratory; is that right?
A. Yes, ma'am.
Q. Why didn't you request fingerprinting on the evidence?
A. You have to understand the New England Field

Division, that laboratory handles all the drugs for the entire area of New England. We had the defendant rented the vehicle, the drugs were found in his bag with his paperwork and information, and he gave a confession.

MR. ROY: Objection, your Honor, to the "confession." Move to strike.

MS. BECKNER: Your Honor, if I could respond?

THE COURT: Briefly.

MS. BECKNER: Yes, I believe the defendant raised the issue of why no fingerprinting was done.

THE COURT: All right. Come on up.

(Side-bar conference.)

MS. BECKNER: Your Honor, the defendant raised an issue as to why no fingerprinting was done, and the officer that requests the testing, we think we ought to be able to explain whe he didn't do that in this particular case. The jury is left with an incomplete picture as to why the Government proceeded that way because you can see where this is going.

I think the Government is entitled to explain given that the defense raised it why they took the particular action they took.

THE COURT: I actually did not hear the question clearly, and that's why -- my screen is not working.

What was the question?

MR. ROY: She had asked why it wasn't fingerprinted.

THE COURT: That's all it was?

MR. ROY: Yes.

THE COURT: What's your point?

MR. ROY: My point is, number one, it's not responsive. Number two --

THE COURT: What's not responsive, the question?

MR. ROY: The fact that he gave a confession is not responsive to why it wasn't fingerprinted. And the First Circuit pattern jury instructions talks about statement of defendants, counsel cautioned against using the word "confession." It's pejorative. The Government can clearly try to explain it.

THE COURT: So you're not objecting to the question of why it wasn't fingerprinted.

MR. ROY: It's the term "confession" that I moved to strike.

MS. BECKNER: Would you like me to instruct the witness to not --

THE COURT: I'll take care of it.

MR. ROY: That's the basis for the objection.

THE COURT: Got it. So this is your last witness?

MS. BECKNER: And I intend to rest after this witness.

THE COURT: So you're going to make a Rule 29 motion?

MR. ROY: Perfunctory.

THE COURT: So what I'm going to do is I'll send the jury out for that. Anne can get my computer fixed. And we'll do that, then we'll bring them back in.

MR. ROY: We have Lynn Simas here for three o'clock. Mullensky is on his day off today. We couldn't get him. He's under subpoena for tomorrow morning.

THE COURT: And Simas is three o'clock?

MR. ROY: I told the marshals around three. They might have her here now.

THE COURT: Okay. We'll find out during the recess.

(End of side-bar conference.)

THE COURT: Ladies and gentlemen, so while counsel are up, I need to take the opportunity to cover some logistical things. The trial is moving a little faster than anyone expected and so I've been, through counsel, trying to work to accelerate some witnesses so we can make use of our whole day today, and so that's some of what I needed to talk to counsel about.

But there is an objection to the last question, and I will -- the way I'm going to handle it is to instruct you to disregard the term "confession." Your job will be to evaluate all of the evidence that's been presented about testimony about what was said or not said and to judge what it is on its own merits, and I'm going to instruct the witness not to use descriptive terms such as that in formulating your answer.

Otherwise, your answer, I think, is not objectionable as it stands. You may then follow-up.

MS. BECKNER: May I repeat the question, your Honor, since the answer was --

THE COURT: I think it was interrupted midstream so you can reformulate your question and we'll go from there.

Q. Officer Jacobson, why didn't you request fingerprints in this case?

A. The different factors regarding the evidence. The defendant, the rental car was in the defendant's name, the drugs were found in his bag with male's clothing and items of paperwork in his name. The probability -- also, the statement that was given.

The probability of finding fingerprints in the hundreds of drug cases I've been involved in, we've gotten fingerprints four times. The factors I named

beforehand, that's what we would call a slam-dunk in the narcotic investigation world. So we didn't fingerprint.

MR. ROY: Objection. I'm going to move to strike the term "slam-dunk," your Honor.

THE COURT: Well, ladies and gentlemen, disregard the terminology, "slam-dunk."

MR. ROY: Can I be heard at side bar, your Honor?

THE COURT: Yes.

(Side-bar conference.)

MR. ROY: "Slam-dunk" is very prejudicial to my client.

THE COURT: Let's take it up at the break.

MR. ROY: That's fine.

THE COURT: It's going to be two minutes.

(End of side-bar conference.)

MS. BECKNER: The Government has no further questions.

THE COURT: Mr. Roy, recross?

MR. ROY: No recross, your Honor. Thank you.

THE COURT: All right. Mr. Jacobson, you may step down. Your testimony is complete.

## CERTIFICATION

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

July 13, 2007

Date