EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

* * * * * * * * * * * * CRIMINAL ACTION
USA * 06-061S
VS. * JUNE 28, 2007
KENT AWER * PROVIDENCE, RI
* * * * * * * * * * * *

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(CLOSING ARGUMENTS)

APPEARANCES:

FOR THE GOVERNMENT: SANDRA BECKNER, ATTY.
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT: EDWARD C. ROY, ESQ.
Federal Public Defender's Office
10 Weybosset St.
Providence, RI 02903

Court Reporter: Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI 02903

Proceeding reported and produced by computer-aided stenography

MS. BECKNER: Ladies and gentlemen of the jury, good morning.

There are three things that when you go back in the deliberation room you're going to have to decide, because this defendant, since he's charged with possession with the intent to distribute 50 grams or more of cocaine base, you're going to have to decide, first, whether the defendant possessed the drugs; second, whether he knew about those drugs; and third, whether or not he had the intent to distribute them.

I want to address each of those points here in my closing argument. First of all, let's talk about possession. You will hear the judge instruct you that possession in the law is not about ownership. It's about control. It's about dominion and control over an object.

In the law, something doesn't have to be in your pocket for you to have possession of it, even though that would be actual possession of something. If you have control over it, you are also in possession of it.

For example, if you own a car, and it's parked out in the street, and it's locked, and you have the keys to that car in your pocket, you have actual possession over the keys, you have constructive possession over your car because you can exercise

control over it.

Similarly, let's say you're married and your wife also owns that car, or husband, he or she also has keys to that car. Both of you can be in possession of the same object. So possession can be actual or constructive, and possession can be sole or joint, and it's still possession.

And that's important in this case, because you're going to have to look at who had control in this case. And the first thing that stands out is the fact that who rented the vehicle that these drugs were found in, who planned this trip and rented the vehicle? The defendant did. When you look at Government Exhibit 7 back in the jury room, you'll see the defendant rented this vehicle on April 29th until May 6 of 2006. He rented the vehicle. So the drugs are in his rental vehicle.

More than that, where within the vehicle were the drugs located? They were located in his suitcase, this black bag pushed all the way back up in the trunk with condoms, candies, men's clothing, and underneath it, the crack cocaine, a half a kilogram of crack cocaine. And right next to that in the same bag is this gray bag filled with the defendant's paperwork.

And you're going to get to go through all the

paperwork and see all the dates on it, numerous items of paperwork in the defendant's name.

So the drugs are located in the defendant's suitcase in the defendant's rental car. The defendant had control over those drugs. He had the ability to exercise control over what's in his car and his bag.

So knowledge. What evidence do you have about that the defendant knew the drugs were there? First of all, the most direct evidence you have, the defendant's own admission. You heard the testimony of Task Force Agent Francesconi and Investigator Darren Ellinwood. They told you about the defendant's admissions. The defendant admitted the crack cocaine was his. The defendant said he had a supplier in New York City. The defendant had admitted he had come from New York City. He admitted that he could get one to two kilograms of raw or powder cocaine at a time from his supplier. He even told the officers how he and his supplier communicate, how he makes the call, places his order, his supplier calls him back, Hey, the drugs are ready. He made all of these admissions to the officers.

But then also look at the defendant's actions. Do you remember how Officer Dubois and Officer Gardner, the patrol officers on the scene, they testified about how nervous the defendant was. He's sweating even

though it's not that hot out at 1:00 in the morning. And he's breathing heavily. He's moving around. The defendant was the one that was acting nervous on that scene. His actions are suggestive of his knowledge.

Also, look at the tactics that were employed in this case. You heard Officer Jacobson tell you, he talked about his training at like interdiction schools and DEA schools, about how they learned that a good way to transport drugs is to put a woman in the car, have a woman driving the drugs. Was that tactic employed here? Absolutely.

Something else that's typically done, a rental vehicle. How convenient that we have a rental vehicle. It keeps the Government from forfeiting the car, and, also, it means that any cop that's watching can't run your plates and find out who you are, find out, you know, what kind of person you are as you're transporting these drugs.

And then, finally, look at the way these drugs were packaged. That is suggestive of the defendant's knowledge, because these drugs were in a vacuum-sealed pack. Remember those photos from the day it was seized? They were in little bundles inside a vacuum-sealed pack. Then there was soap in the trunk. The defendant is the one who has the know-how to mask

the scent of narcotics. He knows you could get a traffic stop. There could be a dog there that could sniff them. He's the one that has the know-how from his past experience as to how to mask, how to hide drugs. The tactics that were employed in this case are classic.

And you heard the evidence of the defendant's convictions. That is evidence that you can infer his knowledge from, and you can infer that he would know how to do those very steps that Officer Jacobson talked about.

Now, intent to distribute. In this case, there is so much crack cocaine here, almost half a kilogram of crack cocaine. And Officer Jacobson told you if you were out buying a $20 bag on the street corner, I mean, you'd get 0.2 grams. He had 2500 times that amount. I mean, street value of this crack cocaine in this case was $50,000. This was a tremendous amount of crack cocaine.

More than that, the fact that it was packaged for distribution, remember those 112 little bundles that range from I think he said like one point something grams up to seven point grams. It's packaged for the customer. Maybe the customer wants a small amount; maybe he wants to save a little money and buy

it in a large amount. This stuff is ready to go. It's ready to put on the shelf. This is a quantity of drugs that is consistent with distribution, not for personal use. And more than that, there is no evidence of crack cocaine use in this case whatsoever.

Now, this morning, you saw the statements that I told you in opening you were going to see, the statements that are allegedly signed or allegedly written by Ms. Johnson, and you will get to read those statements. But I ask you to listen to the Court's instructions and listen to how you are tasked to use your common sense in that jury room. Please do not leave your common sense at the door when you go in to read those statements, because you are entitled to make inferences based upon your reason and common sense.

And ladies and gentlemen, you need to take those statements with a grain of salt. I mean, use your common sense as you read them, because -- let's talk about the detail, for example. When you read those, that first statement, the one that the lieutenant notarized -- and mind you, notarizing it doesn't mean he's saying it's true. He told you that. All he does is say, Yeah, this is the person that signed it. He doesn't even know who wrote it.

But that first statement, Defense Exhibit A, all

that says is I want to take sole responsibility for everything, let it all fall on me. There's no details about -- there's no mention of a supplier. There's no mention of a supplier arrangement. There's no mention of the quantity of drugs that can be purchased. I mean, in fact, in that second, the longer statement, they're just called drugs. There's no mention of raw or cocaine, and there is no mention of quantity anywhere in those statements, unlike the defendant's statement.

The defendant's statement has detail and that should suggest to you, ladies and gentlemen, that something's up with Ms. Johnson's statement and that the statement that is believable in this case is the defendant's.

Now, also, look at how the facts of this case corroborate what the defendant said and not what Ms. Johnson said.

The drugs are in the defendant's car, in the defendant's suitcase. He is the one that took the steps to make this trip happen. That corroborates the fact that they're his drugs. More than that, his behavior, his nervous behavior on the scene. That corroborates that they're his drugs. You know, is young Ms. Johnson, 21 years old, the mastermind behind

all this? Look at the age difference here. There's like a ten-year age difference. The defendant wouldn't even let her answer questions. He was interrupting and answering questions to Officer Dubois for her. Who has the power here? What does that say about the believability of her statement versus his?

You also got a look at the motive, the motive of Ms. Johnson. She's young. She's pregnant. This is her boyfriend. I mean, what are her motives? You've got to look at that as you read the statements.

And then, finally, finally, just the shear improbability of that statement itself. I mean, there's one line in there, and you'll get to see it, it goes something to the effect of I stole the drugs from my uncle, I figured instead of my uncle using all of them, we could sell a little and use a little.

Use a little? 2500 units of crack cocaine in there? No evidence of use, we could sell a little, use a little? And this is instead of her uncle using $50,000 worth of crack cocaine? A little is this. We have a lot here. That just does not make any sense. That shows her inexperience.

More than that, I mean, let's say her uncle is a drug dealer. Let's say he has $50,000 worth of drugs at any given time. Is it going to be that easy to

steal $50,000 worth of drugs from a drug dealer? Is young Ms. Johnson going to be able to go in and steal $50,000 worth of drugs from a drug dealer? No. And more than that, if you're going to commit a theft of that scale, it wouldn't be some impromptu decision where I steal the $50,000 worth of drugs from a drug dealer and, oh, let me see if I can just catch a ride back to Massachusetts. I mean, that's just a ridiculous story.

So ladies and gentlemen, I urge you to focus on the evidence that you heard on the rental car, the defendant's suitcase, the defendant's admission, the defendant's experience in this field to suggest he knows what's going on.

I ask you to focus on all of that, and use your common sense when you take a look at those things. Use your common sense.

MR. ROY: May I approach with Ms. Beckner before I open?

THE COURT: Yes.

(Side-bar conference.)

MR. ROY: Judge, I'm always reluctant to object during counsel's closing argument. I want to register an objection to Ms. Beckner's characterization of the testimony of Jacobson that sometimes a woman is put in

a car as a tactic. I don't recall that testimony at all.

THE COURT: You misstated the testimony. You said that Jacobson testified that sometimes it's a common tactic to have a woman driving the car. Jacobson never said that. I checked the testimony while you were giving your closing. What he testified to was it's a common tactic to have a female and children in the car, not driving the car. So this has to be corrected.

MR. ROY: I'll have to renew, make a separation motion to pass. I have to object for the record.

MS. BECKNER: I'm sorry?

MR. ROY: I'm making a motion for a mistrial based on that.

THE COURT: I understand.

MR. ROY: You can give it later. I didn't want to object on Sandy's closing.

THE COURT: I'm not going to grant a motion for a mistrial over that statement, but I am going to tell the jury right now that that was a mischaracterization of the testimony, what the testimony was.

MS. BECKNER: Okay.

THE COURT: Then you can do your closing.

(End of side-bar conference.)

THE COURT: Ladies and gentlemen, before Mr. Roy proceeds with his closing statement, I need to inform you that one statement made by counsel for the Government during closing statement mischaracterized the testimony of Officer Jacobson.

Ms. Beckner said that Officer Jacobson testified that a common tactic of drug dealers was to have a female driving a vehicle. Officer Jacobson's testimony did not say that. His testimony was a common tactic of drug dealers was to have females and/or children in a vehicle. He said nothing about driving. So I feel a need to make that correction for you.

All right. Mr. Roy, you go ahead with your closing argument.

MR. ROY: Judge Smith, Counsel, Detective, ladies and gentlemen of the jury, I want to talk to you now about reasonable doubt, the reasonable doubt that exists in this case as we sit here this morning.

The Government has the burden of proving each of the elements that is charged beyond a reasonable doubt, but I believe that when you cut to the chase, this case really hinges on whether or not the Government has proven beyond a reasonable doubt did Kent Awer know of the drugs.

The direct evidence is, as the Government

claims, his statement. I think when you look at the statement and you use your common sense as the Government and the defendant ask you to do, there's doubts about that statement.

First of all, it was never put in writing. And Ms. Beckner is claiming here about this is a case of great magnitude, which it is, wouldn't you think that in that kind of a case they'd take the steps of at least offering it? He just admitted to a $50,000 bag of cocaine. Do you want to put that in writing? Did you make a mistake? They didn't take that tactic at all. They never even offered him the opportunity to put his statement in writing. And he referred, according to the officers, to powder and not the crack cocaine. And his statement was made in reference to cooperation.

When you examine how the statement was made, this was not Kent Awer saying, Officers, I want to talk to you about this case; I want to tell you what I did.

They pulled him out of his cell after being in there all night and brought him up to the room and said, We want to talk to you; you can help yourself here. And then, suddenly, that turns into a statement used against him saying it ties into the drugs. It doesn't make any sense, ladies and gentlemen of the

jury.

In opening argument, turning to the Dianikqua Johnson statements, Ms. Beckner said that they were going to show that Ms. Johnson was Kent Awer's girlfriend. They never proved that, ladies and gentlemen of the jury. There's nothing at all about that.

I want to now read into the record for you what these statements say, because it's my argument to you this morning that each statement, when you take them in the light of all the evidence, shows reasonable doubt of Kent Awer's knowledge of drugs.

Exhibit A: (Reading:) To the Honorable Courts: I, Dianikqua Johnson, would like to speak on my behalf. I, Dianikqua Johnson, want to notify Providence Superior Court I take sole responsibility for this charge. I am being charged with manufacturing, possessing, delivery of cocaine. Mr. Simmons and Mr. Awer that's being charged with me had no knowledge of my criminal activity.

I'd also like to thank the courts for taking the time out to listen to this matter. Truthfully yours, Dianikqua Johnson.

You heard Lieutenant Mullensky say he notarized it.

The second statement does get into additional details. If I could have one moment to retrieve that.

Exhibit B, says, (Reading:) I, Dianikqua Johnson, would like to make a statement on my behalf. The charges I am being charged with Mr. Awer and Mr. Simmons, I take full responsibility for those charges. I acted alone. They had no knowledge of my criminal activity.

On May 1st, 2006, I called Mr. Awer to make sure he could give me a ride to Mass. He stated that he will give me a ride and would I be sure to drive because he's real tired. I told him yes. Then he's around -- this was around 8:00 p.m. Fifteen minutes later he called to let me know he was downstairs in the parking lot of my grandmother's projects, Tompkins.

When I reached the car, Awer was already relaxing in the passenger seat. I put my bags down by the trunk and I walk over to the driver's side, open the door so I can pop the trunk on the car key chain. While I was in the trunk of the car, I took the packages of drugs we're being charged with out of my handbag, then put them in Awer's black Ascot bag, because I felt his bag had more spots to hide the drugs in, and it did.

I then got in the car, and Mr. Awer told me where to go to pick up his friend, Mr. Simmons, before leaving for Mass. Picked him up on Willoughby Avenue at 9:00 p.m., I took the drugs or I got the drugs from my uncle. Well, I stole them. I know we needed the money so I figured instead my uncle using of them, I could get rid of some, sell a little, use a little.

That's reasonable doubt, ladies and gentlemen of the jury. When you weigh that against the Government's case, there is reasonable doubt. There are circumstances of trustworthiness when you look at Dianikqua Johnson's statements.

The officers both testified, that's Ellinwood and Francesconi, that on the night of the arrest she was very, very emotional. She didn't admit anything to them, but we don't know how she was questioned or whatever, but she was very emotional.

And you also know from Lynn Simas that five or six weeks later at the ACI she was very, very emotional about these circumstances, about these charges that were filed against Kent Awer, and she wanted to right that, and that's what she did. She made a statement to Lieutenant Mullensky. That has the ring of truth, ladies and gentlemen of the jury.

You've heard the Government argue that the

convictions that Mr. Awer had eight, nine, ten, eleven years ago showed knowledge of these drugs. Mr. Awer signed a stipulation agreeing that those convictions exist. But what do the actions that took place that many years ago really show about what happened on May 1st and May 2nd, 2006? They really don't, ladies and gentlemen of the jury. He made mistakes back then. He signed a stipulation saying that I'm not going to hide from that when the jury gets my case. They happened, but they really don't show knowledge. Think in your own lives or your own circumstances whatever happened that many years ago really doesn't bear on your knowledge, 11, 12, 13 years later.

Talk about the suitcase, the Prada bag and the suitcase. You'll have a chance to look at that. It contains materials that had Kent Awer's name on it, but who walks around with all of their personal papers in a neat, little bag like that? Does it make any sense that you'd take the time to put your materials in a Prada shoe bag, or whatever kind of bag that is? Why would anybody do that? And why, if Mr. Awer is the seasoned drug dealer that Ms. Beckner claims, why would he take and put the drugs in the bag with his papers if that was the case?

There's also other circumstances about the

masking agents that show reasonable doubt. The officers testified that the masking agents were found in other bags in the trunk, not just loose in the trunk. And they weren't in the bag where the drugs were. They were in other bags and placed in other areas in the trunk, suggesting that somebody else had access to that trunk. And you know from Dianikqua Johnson's statement that she had access. You heard about men's clothes in the Ascot bag. The Government never told you anything at all about Lashon Simmons. We don't know what size the clothes were. We don't know what size man Lashon Simmons is. Do the clothes fit him? Do the clothes fit Kent Awer? You don't know that right now. You don't know if anybody was wearing Prada shoes. Small point but there's really no connection to that Prada shoe bag other than the fact of the paperwork in it. You don't know who put the paperwork in it.

It would be easy if they fingerprinted it, and it would be an easier case if they fingerprinted the actual bag the drugs were in, but they didn't because it was a rush to judgment. They thought they had Kent Awer based on the work they had done, and they didn't take all the steps that were necessary to show beyond a reasonable doubt that he possessed those drugs.

So for all these reasons, ladies and gentlemen of the jury, there is reasonable doubt in this case, and I ask you to find the defendant not guilty. Thank you.

THE COURT: Thank you, Mr. Roy.

Ms. Beckner, you have a couple of minutes for rebuttal.

MS. BECKNER: Yes, your Honor.

Ladies and gentlemen, beyond a reasonable doubt is not beyond all possible or any conceivable doubt. Reasonable, use your reason, ladies and gentlemen, as you evaluate this evidence. Use your reason, once again, think of the rental car, who rented it, the suitcase, the statement, all of that. Use your reason and common sense as you look at all of this evidence.

Do you know what? Even if you don't think that the defendant possessed these drugs alone, even if you don't think that these were just Kent Awer's drugs because they were in his suitcase, he made the admissions and they were in his rental car; even if you don't think that, that still does not mean that he is not guilty. Possession can be joint. It's about control. It's about control and possession can be joint. More than that, somebody -- let's say you thought, you know what, there must be some grain of

truth in Ms. Johnson's statement. There must be some grain of truth in there. She's the mastermind behind this. The defendant helped her. The defendant's car is -- these drugs were transported in the defendant's car. They were transported in his suitcase. If you find that he knew about those drugs for all the reasons I argued to you the last time I was up here, if you find that he knew about those drugs, and he helped her because you think she's the mastermind behind all this, he's still guilty.

So ladies and gentlemen, I'm not going to repeat everything I said before, but just, please, use your common sense, look at all the evidence, and at the end, ladies and gentlemen, the Government asks that you return a finding of guilty.

# C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Anne M. Clayton

Anne M. Clayton, RPR

July 13, 2007

Date